UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WALTER HARRINGTON,

                Petitioner,                              Hon. Janet T. Neff

v.                                                   Case No. 1:09-CV-122

KENNETH McKEE,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

This matter is before the Court on Harrington's petition for writ of habeas corpus. In accordance with 28 U.S.C. § 636(b) authorizing United States Magistrate Judges to submit proposed findings of fact and recommendations for disposition of prisoner petitions, the undersigned recommends that Harrington's petition be **denied**.

## BACKGROUND

As a result of events that allegedly occurred from 2001 to 2003, Petitioner was charged with two counts of first degree criminal sexual conduct and three counts of second degree criminal sexual conduct.  (Trial Transcript, June 1, 2004, 11-12).  Several individuals testified at Petitioner's jury trial.  The relevant portions of their testimony are summarized below.

1

**Michael Jensen**

Jensen first met Petitioner "about" 12 years previously when he was approximately ten years of age. (Trial Transcript, June 2, 2004, 416). Jensen, his siblings, and his mother, Irene Jensen, subsequently moved in with Petitioner. (Tr. 416).

One day in July 2003, Jensen traveled to a cabin that Petitioner owned, but was renting to Pete Brown. (Tr. 418-20, 446). When Jensen arrived at the cabin, Petitioner was watching a pornographic movie with Jensen's younger brother, W.H. (Tr. 420-22). When Jensen asked Petitioner "why he would be watching something like that with [his] little brother," Petitioner did not respond. (Tr. 422).

Approximately three days later, Jensen was at his mother's residence. (Tr. 423-24). At approximately 4:00 a.m., Petitioner returned home with W.H. (Tr. 424). Jensen's mother, upset with Petitioner for "bringing [W.H.] home at 4:00 in the morning," asked Petitioner to leave. (Tr. 424-25). An argument between the two ensued, during which Petitioner "dumped Kool-Aid on [Irene Jensen's] head." (Tr. 425-26). Irene Jensen then telephoned the police. (Tr. 426-27). When the police arrived, Michael Jensen informed the police of the pornographic movie incident he witnessed several days previously. (Tr. 427).

**Travis Chellis**

As of July 13, 2003, Chellis was employed with the Antrim County Sheriff's Department. (Trial Transcript, June 2, 2004, 468-69). At approximately 4:30 a.m. that morning, Chellis was dispatched to Irene Jensen's residence to investigate an alleged domestic disturbance. (Tr. 468-69). As part of his investigation, Chellis spoke with Michael Jensen. (Tr. 470). Chellis

learned that the argument between Petitioner and Irene Jensen was precipitated, in part, by the fact that Petitioner stayed out too late with W.H.  (Tr. 485).  Chellis learned that the argument also involved allegations of a bi-sexual relationship between Petitioner and Pete Brown.  (Tr. 488-89).

Michael Jensen also informed Chellis about an incident involving "pornographic videos."  (Tr. 470-71, 483).  As a result of what he learned from Jensen, Chellis concluded that "there was inappropriate behavior going on with the children."  (Tr. 473).  Chellis reported the matter to the Family Independence Agency.  (Tr. 473-74).

**Paula Lipinski**

As of July 14, 2003, Lipinski was employed as a Children's Protective Service Worker for the Family Independence Agency.  (Trial Transcript, June 8, 2004, 574-75).  On that date, Lipinski traveled to Irene Jensen's residence to investigate whether the children at that location were at risk.  (Tr. 576-78).  Lipinski and her co-worker, Jeannie Dunigan, first spoke with Irene Jensen, who provided information regarding possible sexual abuse of N.H. by Petitioner.  (Tr. 642-43, 652-54, 659).  Believing that sexual abuse was more serious than "kids watching the porno tape," Lipinski and Dunigan spoke with N.H. first.  (Tr. 578-79, 642-43).

Lipinski interviewed N.H. using forensic interviewing techniques designed to allow N.H. to tell her story in "free narrative" form in her own words.  (Tr. 580-83).  Lipinski did not question N.H. using leading questions.  (Tr. 602).  The interview began in the master bedroom because Irene Jensen believed that N.H. would feel comfortable there.  (Tr. 579, 601).  However, after N.H. reported that abuse had occurred in that particular bedroom, the interview was terminated and resumed later that day at a nearby Michigan State Police post.  (Tr. 582-85).  Lipinski discerned

3

no inconsistencies in N.H.'s statements during the two interviews.  (Tr. 610).  Lipinski subsequently interviewed N.H.'s siblings, W.H. and A.H.  (Tr. 587).  W.H. appeared to be "quite uncomfortable and scared and closed."  (Tr. 647-48).

**N.H.**

N.H. testified that she was ten years of age and has five siblings: (1) Melanie, approximately 24 years old; (2) Michael, approximately 23 years old; (3) W.H., eight years old; (4) A.H., six years old; and (5) K.H., four years old.  (Trial Transcript, June 8, 2004, 674, 678, 681).

The previous summer, N.H.'s mother had a job that required her to work from 9:00 p.m. until 7:00 a.m.  (Tr. 679).  When N.H.'s mother was at work, Petitioner cared for N.H. and her younger siblings.  (Tr. 677-79).  During these times, Petitioner taught the children about sex using magazines, books, and "sex movies."  (Tr. 679-80, 683-86).  Petitioner would watch "sex movies" with N.H., W.H., and sometimes A.H. and K.H.  (Tr. 681).  After watching these movies, Petitioner would often take N.H. into his bedroom to teach her about sex.  (Tr. 682).

When N.H. and Petitioner were in bed together they "would touch each other's private parts."  (Tr. 687).  Specifically, Petitioner would touch N.H.'s vagina and N.H. would touch Petitioner's penis.  (Tr. 687-88).  Petitioner touched N.H.'s vagina with his hands and his tongue.  (Tr. 689).  Petitioner and N.H. engaged in this conduct on multiple occasions.  (Tr. 697-98).  N.H. further testified that, "sometimes I'd lick his dick."  (Tr. 689, 692, 702).  On at least one occasion, Petitioner held a mirror to N.H.'s vagina and "pull[ed] it open a little bit so that [N.H.] could see the inside."  (Tr. 694-95).

On at least one occasion, Petitioner asked N.H. to rub W.H.'s penis, which she did.

4

(Tr. 696). On another occasion, W.H. and N.H. "touch[ed] each other's private parts." (Tr. 696-97, 703-04). Petitioner also rubbed W.H.'s penis. (Tr. 705-06). Petitioner engaged in this conduct for an approximately two year period. (Tr. 723). N.H. never told her mother about this activity because Petitioner warned her, "don't tell or we'll all go to jail." (Tr. 698-99).

**W.H.**

W.H. testified that he was 8 years old and has one brother, Michael, and four sisters, Melanie, A.H., K.H., and N.H. (Trial Transcript, June 8, 2004, 772, 776). W.H. occasionally spent time at "the cabin" with Petitioner. (Tr. 777). On one of these occasions, he watched a "sex movie" with Petitioner. (Tr. 777-78). While W.H. and Petitioner were watching this "sex movie," W.H.'s brother, Michael, entered the cabin and "got in a fight with" Petitioner. (Tr. 778).

W.H.'s mother worked "at night." (Tr. 780). When W.H.'s mother was at work, Petitioner cared for the children. (Tr. 781). During these occasions, W.H. would "sometimes" watch "sex movies" with Petitioner and his siblings. (Tr. 781). After watching these movies, Petitioner would "teach" W.H. and N.H. about "what sex is about." (Tr. 781-82). W.H. witnessed Petitioner touching N.H.'s "pussy." (Tr. 783-84). Petitioner also "made" W.H. touch N.H.'s "pussy." (Tr. 783-84). Petitioner was also present when N.H. touched W.H.'s penis. (Tr. 784-85).

**Jack Patton**

As of July 2003, Patton was employed as a Corrections Officer for the Antrim County Sheriff's Department. (Trial Transcript, June 8, 2004, 803-04). On one particular occasion during July 2003, Patton was transporting Petitioner back to the jail following his arraignment. (Tr. 803-

5

04).  During the ride back to the jail Petitioner stated that he "didn't understand what the big deal was about."  (Tr. 804).  Petitioner stated that he "hadn't done anything wrong, he was teaching these kids the facts of life."  (Tr. 804).

**David Kaiser**

As of July 14, 2003, Kaiser was employed as a Michigan State Trooper.  (Trial Transcript, June 8, 2004, 818-19).  On that date, Kaiser arrested Petitioner and transported him to the Mancelona Police Department.  (Tr. 818-24).  Before interviewing Petitioner, Kaiser informed Petitioner of his *Miranda* rights.  (Tr. 824-26).  Petitioner stated that he understood his rights and was willing to speak with Trooper Kaiser.  (Tr. 826-27).  Trooper Kaiser interviewed Petitioner in a conference room at the Mancelona Police Department.  (Tr. 827-29).  Petitioner's handcuffs were removed and the pair sat at a conference table.  (Tr. 830).  Petitioner was not intoxicated and did not appear to be impaired in any way.  (Tr. 831).  Petitioner was provided with water.  (Tr. 835).

At the outset of the interview, Trooper Kaiser stated that he had spoken with Petitioner's children and that "the children had made some statements that caused some concern." (Tr. 838).  Kaiser asked Petitioner if "he could explain those statements."  (Tr. 838).  Petitioner responded that "he was only trying to teach his children."  (Tr. 839).  Petitioner stated that he used "R-rated" movies to teach his children.  (Tr. 844-46).  Petitioner stated that after watching these movies he and the children would go into Petitioner's bedroom so that he could answer any questions they might have.  (Tr. 848).  During these occasions, Petitioner and the children would all be naked.  (Trial Transcript, June 8, 2004, 848; Trial Transcript, June 9, 2004, 875).  Petitioner taught his children both the "proper" and "slang" names for male and female genitalia.  (Trial

6

Transcript, June 8, 2004, 849).

Petitioner acknowledged that he digitally penetrated N.H.'s vagina, but asserted that it was for "educational purposes." (Tr. 849-50). Petitioner stated that he "allowed N.H. to touch W.H.'s penis" and that he "in turn allowed W.H. to touch N.H.'s vaginal area." (Tr. 851). Petitioner stated that he "allowed" the children to "touch his penis." (Trial Transcript, June 9, 2004, 876). Petitioner acknowledged that "it was possible" that he performed oral sex on N.H., but that he would have only done so "for educational purposes to teach her how this was done." (Tr. 878). Petitioner also stated that he "might have" allowed N.H. to "give him a blow job. . .for a minute or so," but that it would have been for "educational purposes" only. (Trial Transcript, June 8, 2004, 851; Trial Transcript, June 9, 2004, 879). Petitioner instructed the children not to tell their mother about what they were doing because she "was kind of prudish." (Trial Transcript, June 8, 2004, 848-49).

Following the presentation of evidence, the jury found Petitioner guilty of two counts of first degree criminal sexual conduct and three counts of second degree criminal sexual conduct. (Trial Transcript, June 10, 2004, 1147-48). Petitioner was sentenced to serve 15 to 40 years in prison. (Sentence Transcript, July 7, 2004, 30-32). Petitioner appealed his convictions in the Michigan Court of Appeals, asserting the following claims:

> I.   The trial court erred in denying Defendant's unopposed request for a mistrial, which was based on the disclosure that complainants had undergone medical examinations after defense counsel had made a point in both jury voir dire and his opening statement that no medical examinations were conducted.

> II.  Mr. Harrington's constitutional right to the effective assistance of counsel was denied and he is entitled to a new trial under the per se rule of presumptive prejudice.

III.    Mr. Harrington was denied a fair and impartial trial when the trial court failed to grant the deliberating jury's request to review the testimony of N.H., the main child complainant, over defense counsel's objection.

IV.    The trial court abused its discretion under MCR 6.201(C), violated MCR 6.201(D), and violated defendant's right to due process by denying Mr. Harrington's motion for an in camera review of the portion of the children's psychological counseling records that the prosecutor had redacted.

V.    Defendant Harrington was denied his due process rights to a fair trial by the perjury of the chief investigating officer, Trooper David Kaiser.

VI.    There was insufficient evidence for bindover (and conviction) on the charges.

The Michigan Court of Appeals affirmed Petitioner's conviction. *People v. Harrington*, 2006 WL 397937 (Mich. Ct. App., Feb. 21, 2006). Petitioner subsequently moved in the Michigan Supreme Court for leave to appeal asserting the following claims:

I.    Defendant Harrington was denied his due process rights to a fair trial by the perjury of the chief investigating officer, Trooper David Kaiser.

II.    Was Mr. Harrington's constitutional right to the effective assistance of counsel denied and is he entitled to a new trial under the per se rule of presumptive prejudice?

III.    Mr. Harrington was denied a fair and impartial trial when the trial court failed to grant the deliberating jury's request to review the testimony of N.H., the main child complainant, over defense counsel's objection.

IV.    The state trial court denied Defendant due process of law under the Sixth and Fourteenth Amendments to

8

the U.S. Constitution where factors were utilized for upward departure which were not charged, nor waived, nor put before a jury, and are offensive to the new rule of law set forth by the U.S. Supreme Court, and where lack of grand jury indictment offends Article V, U.S. Constitution.

V.      Defendant's federal constitutional right to present a defense was violated by the state court's failure to allow the jury to consider relevant and highly probative evidence of the guilt of a third party and the improperly excluded evidence undermined confidence of the case and rendered the trial fundamentally unfair.

The court denied Petitioner's request, stating that "we are not persuaded that the questions presented should be reviewed by this Court." *People v. Harrington,* 727 N.W.2d 583 (Mich. 2007). Petitioner later filed in the trial court a motion for relief from judgment,[1] which was denied on September 19, 2007. *People v. Harrington*, No. 03-3686-FH, Order (Antrim Cnty. Cir. Ct., Sept. 19, 2007). Petitioner then moved in the Michigan Court of Appeals for leave to appeal this determination, asserting the following claims:

I.      Was Mr. Harrington denied his 5th and 14th Amendment federal constitutional right to due process and a fair trial by the knowing use of perjured testimony of the chief investigating officer, Trooper David Kaiser?

II.     Was Mr. Harrington denied his federal constitutional right to effective assistance of trial counsel and effective assistance of appellate counsel as guaranteed by the sixth amendment?

III.    Was Mr. Harrington denied his 5th and 14th Amendment federal constitutional right to present a defense by the trial court's refusal to allow the jury to

---

[1]  The record does not reflect the precise issues advanced in this motion.

consider relevant and highly probative evidence of third party guilt, undermining confidence in the proceedings and preventing Mr. Harrington from proving actual innocence, thus rendering the trial fundamentally unfair?

Petitioner's request was denied "for lack of merit in the grounds presented." *People v. Harrington*, No. 281560, Order (May 13, 2008).  Asserting the same three claims, Petitioner moved in the Michigan Supreme Court for leave to appeal this determination.  Petitioner's request was denied on the ground that Petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)." *People v. Harrington*, No. 136583, Order (Mich., July 29, 2008).  On February 12, 2009, Petitioner initiated the present action in which he asserts the following claims:

> I.  The prosecutor's knowing use of perjured testimony.
>
> II.  Ineffective assistance of trial and appellate counsel.
>
> III.  Denial of the right to present a defense of third party guilt.

## STANDARD OF REVIEW

Harrington's petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA), as it amended 28 U.S.C. § 2254.  The AEDPA amended the substantive standards for granting habeas relief under the following provisions:

> (d)  An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> > (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of

the United States, or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The AEDPA has "modified" the role of the federal courts in habeas proceedings to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Pursuant to § 2254(d)(1), a decision is "contrary to" clearly established federal law when "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law" or "if the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at an opposite result."  *Ayers v. Hudson*, 623 F.3d 301, 307 (6th Cir. 2010) (quoting *Williams v. Taylor*, 529 U.S. 362, 405 (2000)).

Prior to *Williams*, the Sixth Circuit interpreted the "unreasonable application" clause of § 2254(d)(1) as precluding habeas relief unless the state court's decision was "so clearly incorrect that it would not be debatable among reasonable jurists."  *Gordon v. Kelly*, 2000 WL 145144 at *4 (6th Cir., February 1, 2000); *see also*, *Blanton v. Elo*, 186 F.3d 712, 714-15 (6th Cir. 1999).  The *Williams* Court rejected this standard, indicating that it improperly transformed the "unreasonable application" examination into a subjective inquiry turning on whether "at least one of the Nation's jurists has applied the relevant federal law in the same manner" as did the state court.  *Williams*, 529 U.S. at 409.

In articulating the proper standard, the Court held that a writ may not issue simply because the reviewing court "concludes in its independent judgment that the relevant state-court

decision applied clearly established federal law erroneously or incorrectly." *Williams,* 529 U.S. at 411.    Rather, the Court must also find the state court's application thereof to be *objectively* unreasonable. *Bell*, 535 U.S. at 694; *Williams*, 529 U.S. at 409-12.    Accordingly, a state court unreasonably applies clearly established federal law if it "identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case" or if it "either unreasonably extends or unreasonably refuses to extend a legal principle from the Supreme Court precedent to a new context." *Ayers*, 623 F.3d at 307. Furthermore, review under § 2254(d)(1) "is limited to the record that was before the state court that adjudicated the claim on the merits." *Cullen v. Pinholster*, - - - S.Ct. - - -, 2011 WL 1225705 at *8 (Apr. 4, 2011).

Pursuant to 28 U.S.C. § 2254(d)(2), when reviewing whether the decision of the state court was based on an unreasonable determination of the facts in light of the evidence presented, the "factual determination by [the] state courts are presumed correct absent clear and convincing evidence to the contrary." *Ayers*, 623 F.3d at 308.    Accordingly, a decision "adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding." While this standard is "demanding" it is "not insatiable." *Id.*

For a writ to issue pursuant to § 2254(d)(1), the Court must find a violation of clearly established federal law "as set forth by the Supreme Court at the time the state court rendered its decision." *Stewart v. Irwin*, 503 F.3d 488, 493 (6th Cir. 2007).    This definition of "clearly established federal law" includes "only the holdings of the Supreme Court, rather than its dicta." *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).    Nevertheless, "the decisions of lower federal

courts may be instructive in assessing the reasonableness of a state court's resolution of an issue." *Stewart*, 503 F.3d at 493.

As previously noted, § 2254(d) provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits" unless the petitioner can satisfy the requirements of either § 2254(d)(1) or § 2254(d)(2). This provision, however, "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington v. Richter*, 131 S.Ct. 770, 785 (2011). Instead, when a federal claim has been presented to a state court and the state court has denied relief, "it may be presumed that the state court adjudicated the claim on the merits." *Id.* at 784-85. Where such is the case, the Court must apply the deferential standard of review articulated above, rather than some other less deferential standard.

The presumption that the state court "adjudicated [a] claim on the merits" may be overcome only "when there is reason to think some other explanation for the state court's decision is more likely." *Id.* If this presumption is overcome, however, the Court reviews the matter de novo. *See Wiggins v. Smith*, 539 U.S. 510, 533-35 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *see also, Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

## ANALYSIS

### I.          Prosecutorial Misconduct

Petitioner was interviewed by Trooper David Kaiser following his arrest.  As discussed below, a portion of this interview was recorded on audio tape.  Petitioner asserts that "these taped statements were admitted into evidence by the trooper's false testimony."  Specifically, Petitioner asserts that Trooper Kaiser: (1) lied about why there existed a pause in the recording; (2) lied about informing him of his *Miranda* rights prior to their interview; and (3) lied when he testified that Petitioner never requested an attorney.  Petitioner asserts that his right to a fair trial was violated because the prosecutor knowingly presented Trooper Kaiser's false testimony.  Petitioner also asserts that his arrest was illegal and that his statements to Trooper Kaiser were "coerced" and "false."

First, with respect to Petitioner's arrest, whether such was illegal is irrelevant.[2] *See Gerstein v. Pugh*, 420 U.S. 103, 118-19 (1975) (recognizing the "established rule" that an illegal arrest does not void a subsequent conviction); *United States v. Crews*, 445 U.S. 463, 474 (1980) ("[a]n illegal arrest, without more, has never been viewed as a bar to subsequent prosecution, nor as a defense to a valid conviction"); *Chatman v. Slagle*, 107 F.3d 380, 383 (6th Cir. 1997) ("[a]n illegal search or seizure affects only what evidence the state may introduce, not whether a prosecution may go forward and a conviction obtained").

---

[2]  While resolution of the legality of Petitioner's arrest is not necessary to resolve this claim, Petitioner's arrest certainly appears to be legal.  Trooper Kaiser testified that Petitioner was not detained pursuant to an arrest warrant, but that Petitioner's arrest was premised on probable cause, based on his interviews of the children, that Petitioner committed criminal sexual conduct.  A warrantless arrest is legal when an officer has probable cause to believe that the individual committed a felony.  *See Peoples v. United States*, 2010 WL 4279121 at *4 (W.D. Mich., Oct. 25, 2010) (citing *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)).

Petitioner next claims that he is entitled to relief because his statements to Trooper Kaiser were coerced and, therefore, admitted in violation of his constitutional rights. A confession is admissible if voluntarily made and voluntariness is determined by the totality of the circumstances. *See, e.g., United States v. Williams*, 612 F.3d 417, 420-22 (6th Cir. 2010). When assessing whether a confession is voluntary, the Court must consider a variety of circumstances, including: (1) the length of the interrogation; (2) its location; (3) its continuity; (4) the defendant's maturity, education, physical condition, and mental health; (5) whether the defendant was informed of his *Miranda* rights; and (6) whether there is evidence of police coercion. *Id.* at 420-21.

At the suppression hearing, Trooper Kaiser testified that after arresting Petitioner he informed him of his *Miranda* rights. (Hearing Transcript, January 27, 2004, 31). After arriving at the Mancelona Police Department, but before the interview began, Kaiser removed Petitioner's handcuffs, allowed Petitioner to stretch, provided Petitioner with water, and permitted him to use the bathroom. (Tr. 31-33). Petitioner did not appear to be intoxicated, injured, or under the influence of any controlled substance. (Tr. 33-34, 43). Petitioner appeared to be "a relatively educated man." (Tr. 42). Trooper Kaiser was "very straightforward" with Petitioner and did not strike or threaten Petitioner. (Tr. 34-44). The interview in question lasted less than two hours. (Trial Transcript, June 8, 2004, 831). The record contains no evidence that Petitioner was in any way coerced to speak with Trooper Kaiser or that any of Petitioner's subsequent statements were in any way coerced or involuntary. Accordingly, the Court discerns no basis for suppressing Petitioner's statements to Trooper Kaiser.

Finally, Petitioner's claim of prosecutorial misconduct is without merit. It is well established that "due process is denied where the state has contrived a conviction through the

15

pretense of a trial which in truth is but used as a means of depriving a defendant of liberty through a deliberate deception of court and jury by the presentation of testimony known to be perjured." *Brooks v. Tennessee*, 626 F.3d 878, 894 (6th Cir. 2010) (quoting *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).  Accordingly, the "knowing use of false or perjured testimony constitutes a denial of due process if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Brooks*, 626 F.3d at 894.  To establish such a violation of due process, Petitioner must demonstrate that (1) the testimony was actually false, (2) the testimony was material, and (3) the prosecution knew of its falsity. *Id.* at 894-95.  Moreover, Petitioner must establish that "the testimony was actually perjured, and mere inconsistencies in testimony by government witnesses do not establish knowing use of false testimony." *Id.*

Trooper Kaiser arrested Petitioner on July 14, 2003, and immediately transported him to the Mancelona Police Department so that an interview could be conducted.  (Trial Transcript, June 8, 2004, 818-30).  The interview began at approximately 8:35 p.m. and concluded at approximately 10:25 p.m. (Tr. 831).  Trooper Kaiser did not record the entire encounter, however, but instead only began recording the interview at approximately 9:45 p.m. (Tr. 831).  Kaiser did not record his interview with Petitioner from the outset because he wanted to first "build a little rapport" with Petitioner.  (Tr. 837).  Trooper Kaiser indicated that had he recorded the interview from the outset, Petitioner may not have been as willing to offer "his side of the story."  (Tr. 837).  After Kaiser "went through all [his] questions," he began recording the interview and asked Petitioner "the same questions again."  (Tr. 840-41).  The answers Petitioner provided during the taped portion of the interview were "pretty much" the same as those he initially provided.  (Tr. 840).

During the taped portion of the interview, Trooper Kaiser was interrupted by

16

Mancelona Township Police Officer Rocky Windish, who informed Kaiser that the Antrim County Central Dispatch wanted to speak with him.  (Trial Transcript, June 9, 2004, 885).  In response, Trooper Kaiser stopped the recorder and "asked Officer Windish if he would sit with Mr. Harrington for a couple of minutes."  (Tr. 885-86).  Trooper Kaiser was absent for 10-15 minutes, after which he returned, "hit the record button," and continued his interview with Petitioner.  (Tr. 886-87).

Petitioner offers no evidence to support his claim that Trooper Kaiser's testimony concerning the pause in the recording was false.  Petitioner instead simply asserts the conclusion that Trooper Kaiser lied at trial about this particular matter.  While this claim was asserted on direct appeal, it was not raised by Petitioner's appellate counsel but was instead asserted by Petitioner in a supplemental pleading.  (Dkt. #35).  In that pleading, Petitioner supported his claim by referencing Trooper Kaiser's testimony at the preliminary examination.

During that proceeding, Petitioner's attorney asked Trooper Kaiser, "[t]here's points where you stop and then you start the tape back up again, is that correct?"  (Preliminary Examination Transcript, August 26, 2003, 90-91).  In response, Trooper Kaiser stated, "[t]hat would have been one instant there and that would have been where Mancelona Officer Rocky Windish came in through the back garage into the conference room and I paused the tape until he was through."  (Tr. 91).  This hardly supports Petitioner's contention that Trooper Kaiser lied at trial about the pause that existed in the recording.  To the contrary, Trooper Kaiser's testimony at the preliminary examination on this point was completely consistent with the testimony he offered at Petitioner's trial.

Petitioner next asserts that Trooper Kaiser lied about informing him of his *Miranda* rights prior to their interview and lied when he testified that Petitioner never requested an attorney.

As discussed above, Trooper Kaiser testified that Petitioner was informed of his *Miranda* rights and agreed to waive such and discuss the matter in question.  Kaiser was never directly asked if Petitioner ever requested to speak with or contact an attorney.  Trooper Kaiser did, however, testify that "[i]f Mr. Harrington asked for an attorney or requested to use the telephone to call an attorney, I would have granted him that."  (Trial Transcript, June 9, 2004, 919-20).  While not directly stated, the clear implication of this testimony is that Petitioner did not request to speak with or contact an attorney.  Petitioner has offered no evidence to the contrary and has identified nothing in the record calling into question Trooper Kaiser's testimony on these points.

In sum, Petitioner has failed to establish that Trooper Kaiser testified untruthfully. Moreover, even if the Court were to assume that Kaiser had testified falsely, Petitioner has failed to demonstrate that the prosecutor was aware of such.  Thus, Petitioner cannot establish that the prosecutor engaged in any misconduct and, consequently, that his right to a fair trial was violated. Petitioner has likewise failed to establish that his arrest was illegal or that the statements he made to Trooper Kaiser were coerced or otherwise involuntary.

The Michigan Court of Appeals rejected this particular claim, noting that Petitioner "has failed to show any misconduct that may have denied him a fair and impartial trial." *Harrington*, 2006 WL 397937 at *6.  This determination is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, it is not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

18

II.          Procedural Default

Before addressing Petitioner's remaining claims, it is first necessary to determine whether such have been procedurally defaulted and, if not, the standard of review applicable to such.

On direct appeal, Petitioner did not present these claims to the Michigan Court of Appeals,[3] but instead presented them for the first time to the Michigan Supreme Court which denied Petitioner's application for leave to appeal.  On direct review, therefore, the Michigan courts did not review the merits of these particular claims.  On post-conviction review, Petitioner presented the claims in question to the Michigan Court of Appeals and the Michigan Supreme Court.  Thus, these claims have been properly exhausted.  Respondent, however, asserts that the claims in question have been procedurally defaulted precluding review of such by this Court.

Under the procedural default doctrine, federal habeas review is barred where a state court declined to address a petitioner's claims because of a failure to satisfy state procedural requirements.  *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).  Where a petitioner's claims have been procedurally defaulted, the state court judgment rests on an independent and adequate state ground precluding review by a federal court.  *See Coleman*, 501 U.S. at 750-51; *Wainwright v. Sykes*, 433 U.S. 72, 81 (1977); *Harris v. Reed*, 489 U.S. 255, 262 (1989).  If a claim has been procedurally defaulted, federal habeas review is available only if the petitioner can establish either (1) the existence of cause for his default and actual prejudice resulting therefrom, or (2) that the failure to consider the merits of the claim will result in a fundamental miscarriage of justice.  *See Williams v. Bagley*, 380 F.3d 932, 966 (6th Cir. 2004) (citing *Coleman*, 501 U.S. at 750).

---

[3]  Petitioner did assert on direct appeal to the Michigan Court of Appeals a claim of ineffective assistance of trial counsel, but based on different grounds than that asserted presently.

The Sixth Circuit employs a multi-part test to determine if a petitioner has procedurally defaulted a particular issue: (1) there must exist a state procedural rule that is applicable to the claim and with which the petitioner failed to comply; (2) the last state court rendering a judgment in the matter must have actually enforced the state procedural rule; (3) application of the procedural rule in question must constitute an "independent and adequate" state ground on which the state can rely to foreclose review of a federal constitutional claim; and (4) the petitioner cannot demonstrate cause and prejudice excusing the default. *See Tolliver v. Sheets*, 594 F.3d 900, 928 n.11 (6th Cir. 2010).

The trial court denied Petitioner's motion for relief from judgment in a brief Order. It is not clear from the record (or the trial court's Order), however, precisely what issues Petitioner presented in his motion or the extent to which such were resolved on substantive or procedural grounds.  Petitioner then moved in the Michigan Court of Appeals for leave to appeal the trial court's decision.  The Michigan Court of Appeals denied Petitioner's request "for lack of merit in the grounds presented."  Petitioner subsequently moved in the Michigan Supreme Court for leave to appeal this decision.  The Michigan Supreme Court declined Petitioner's request on the ground that Petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)."

Given the decision by the Michigan Supreme Court, Respondent asserts that Petitioner has procedurally defaulted the claims in question.  Controlling authority in the Sixth Circuit used to hold that denial of leave to appeal on the basis that a petitioner "failed to meet the burden of establishing entitlement to relief under MCR 6.508(D)," constituted a sufficient determination that the court's conclusion was based on procedural default thereby precluding federal habeas review. *See, e.g., Burroughs v. Makowski*, 282 F.3d 410, 414 (6th Cir. 2002).

20

As the Sixth Circuit recently concluded, however, such form orders are no longer sufficient to establish that a petitioner has procedurally defaulted the claim in question. *See Guilmette v. Howes*, 624 F.3d 286, 288-92 (6th Cir. 2010). Instead, the Court must look to the "last reasoned state court opinion" to determine whether a particular claim has been denied on the merits or for failure to comply with a state procedural requirement. *Id.* at 291. Here, the "last reasoned state court opinion," is the decision by the Michigan Court of Appeals denying the claims in question "for lack of merit." Such constitutes a decision on the merits sufficient to defeat a claim of procedural default. *See Williams v. McQuiggin*, 2011 WL 2080680 at *8 (E.D. Mich., May 25, 2011) (where Michigan Court of Appeals denied leave to appeal "for lack of merit in the grounds presented" such "did not rest on a procedural bar," but was instead "based on an assessment of the merits" defeating any claim of procedural default).

In sum, Petitioner's remaining claims have been properly exhausted and denied on the merits. Accordingly, in reviewing these particular claims, the Court must apply the deferential standard of review mandated by AEDPA. *See Harrington*, 131 S.Ct. at 784-85.

**III.        Ineffective Assistance of Counsel**

Petitioner asserts three distinct ineffective assistance of counsel claims in this Court. Petitioner claims that his trial counsel was not sufficiently prepared for a suppression hearing, resulting in the admission of "coerced and false" statements. Petitioner next asserts that his trial counsel was "always late and unable to talk with Petitioner" and failed to interview the police "about the different stories regarding the tape." Finally, Petitioner faults his appellate attorney for failing to raise these issues on appeal.

To establish ineffective assistance of counsel, Petitioner must show both deficient performance by his counsel and prejudice resulting therefrom. *See Premo v. Moore*, 131 S.Ct. 733, 739 (2011) (quoting *Knowles v. Mirzayance*, 129 S.Ct. 1411 (2009)).   To establish deficient performance, Petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *Premo*, 131 S.Ct. at 739 (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).   A court considering a claim of ineffective assistance must apply a "strong presumption that counsel's representation was within the 'wide range' of reasonable professional assistance." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 689).   Petitioner's burden is to show that "counsel made errors so serious that [he] was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 687).

Petitioner must further establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.   Prejudice, in this context, has been defined as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Premo*, 131 S.Ct. at 739 (quoting *Padilla v. Kentucky*, 130 S.Ct. 1473, 1485 (2010)); *see also*, *Mahdi v. Bagley*, 522 F.3d 631, 636 (6th Cir. 2008).   The issue is whether counsel's representation "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." *Premo*, 131 S.Ct. at 739 (quoting *Strickland*, 466 U.S. at 690).   This is a heavy burden for Petitioner to meet, because he must establish that his counsel's performance was "so manifestly ineffective that defeat was snatched from the hands of probable victory." *Jacobs v. Mohr*, 265 F.3d 407, 418 (6th Cir. 2001).

As the Supreme Court has made clear, even when reviewing an ineffective assistance of counsel claim *de novo*, "the standard for judging counsel's representation is a most deferential

22

one." *Premo*, 131 S.Ct. at 740.  Likewise, the standard by which petitions for habeas relief are

judged is "highly deferential."  Thus, when reviewing, in the context of a habeas petition, whether

a state court unreasonably applied the *Strickland* standard, review is "doubly" deferential.  *Id.*

(citations omitted).  As the Supreme Court recently concluded:

> The *Strickland* standard is a general one, so the range of reasonable
> applications is substantial.  Federal habeas courts must guard against
> the danger of equating reasonableness under *Strickland* with
> unreasonableness under § 2254(d).  When § 2254(d) applies, the
> question is not whether counsel's actions were reasonable.  The
> question is whether there is any reasonable argument that counsel
> satisfied *Strickland*'s deferential standard.

*Id.* (internal citations omitted).

### 1.    Attorney James Lavender

Petitioner asserts that his trial attorney (James Lavender) was "not prepared for" the

suppression hearing at which Petitioner challenged the admissibility of his statements to Trooper

Kaiser.  Even if the Court assumes that counsel was insufficiently prepared to challenge the

admissibility of the statements in question, Petitioner has failed to submit evidence or identify

anything in the record that would have resulted in the suppression of the statements in question.  As

discussed above, the evidence of record contradicts Petitioner's assertion that his statements to

Trooper Kaiser were coerced or involuntary.

Petitioner has failed to identify any evidence or item in the record that would have

resulted in the suppression of Petitioner's statements to Trooper Kaiser.  Thus, Petitioner cannot

establish that he suffered prejudice as a result of his attorney's allegedly deficient performance.  The

rejection of this claim by the Michigan Court of Appeals is neither contrary to, nor involves an

unreasonable application of, clearly established federal law.  Furthermore, it is not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

2.　　　Attorney Shawn Smith

Petitioner asserts that he is entitled to habeas relief because his trial counsel (Shawn Smith) was "always late and unable to talk with Petitioner."  Petitioner also asserts that Smith failed to interview the police "about the different stories regarding the tape."

Petitioner has presented no evidence, nor has he identified any portion of the record, supporting his allegation that counsel was "always late and unable to talk with Petitioner." However, even if the Court assumes the accuracy of these allegations, Petitioner has failed to demonstrate that he was prejudiced by counsel's alleged deficiencies.  As for counsel's alleged failure to interview the police "about the different stories regarding the tape," Petitioner offers no evidence nor points to any portion of the record to support the notion that there were "different stories regarding the tape" or that the pursuit of such a claim would have resulted in the suppression of his statements to Trooper Kaiser or a different resolution by the jury.

The rejection of this claim by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law.  Furthermore, it is not based on an unreasonable determination of the facts in light of the evidence presented.  Accordingly, this claim raises no issue upon which habeas relief may be granted.

### 3. Appellate Counsel

Petitioner faults his appellate counsel for failing to assert on appeal the claims discussed in the preceding two sections. As discussed above, however, the claims in question are without merit. Thus, Petitioner was not prejudiced by counsel's failure to assert such on appeal. The rejection of this claim by the Michigan Court of Appeals is neither contrary to, nor involves an unreasonable application of, clearly established federal law. Furthermore, it is not based on an unreasonable determination of the facts in light of the evidence presented. Accordingly, this claim raises no issue upon which habeas relief may be granted.

## IV.        Right to Present a Defense

In addition to investigating whether Petitioner sexually assaulted N.H., the police apparently also contemporaneously investigated whether N.H. was sexually assaulted by a man named Pete Brown. (Motion Transcript, March 3, 2004, 3-17). At trial, Petitioner sought to ask N.H. whether she had been sexually assaulted by Pete Brown. (Trial Transcript, June 8, 2004, 742-45). Petitioner sought to establish that to the extent that N.H. was knowledgeable about sex and sexual matters, she learned such from Pete Brown - not Petitioner. (Motion Transcript, March 3, 2004, 10-11). The trial judge refused to allow Petitioner to pursue this line of questioning. (Trial Transcript, June 8, 2004, 745-48). Petitioner asserts that the trial judge's ruling on this matter constituted a "denial of the right to present a defense of third party guilt."

The United States Constitution guarantees to criminal defendants "a meaningful opportunity to present a complete defense." *Varner v. Stovall*, 500 F.3d 491, 499 (6th Cir. 2007) (quoting *Crane v. Kentucky*, 476 U.S. 683, 690 (1986)). This right is not without limits, however,

and may be reasonably restricted "to accommodate other legitimate interests in the criminal trial process." *United States v. Scheffer*, 523 U.S. 303, 308 (1998); *see also*, *Taylor v. Illinois*, 484 U.S. 400, 412-13 (1988) ("[t]he Sixth Amendment does not confer the right to present testimony free from the legitimate demands of the adversarial system"); *Couturier v. Vasbinder*, 385 Fed. Appx. 509, 516 (6th Cir., July 13, 2010) ("the right to present a complete defense is not an unlimited right to ride roughshod over reasonable evidentiary restrictions") (citation omitted).

Criminal defendants "must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Wynne v. Renico*, 606 F.3d 867, 870 (6th Cir. 2010) (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302 (1973)). The application of such rules does not abridge an accused's right to present a defense so long as they are not "arbitrary or disproportionate to the purposes they are designed to serve." *Renico*, 606 F.3d at 870 (quoting *Scheffer*, 523 U.S. at 308). Moreover, as is recognized, trial judges must make many evidentiary rulings during the course of a trial and "the Constitution leaves to the judges who must make these decisions wide latitude to exclude evidence that is repetitive, only marginally relevant or poses an undue risk of harassment, prejudice, or confusion of the issues." *Crane*, 476 U.S. at 689-90.

The trial judge prevented Petitioner from pursuing the matter in question on the grounds that it violated Michigan's Rape Shield law and, furthermore, that it was not relevant. (Motion Transcript, March 3, 2004, 7; Trial Transcript, June 8, 2004, 747). The Court, however, need not address whether the trial court's decision violated Petitioner's constitutional right to present a defense. Even if the Court assumes that Petitioner's right to present a defense was violated, he is not entitled to habeas relief because such violation is harmless.

When resolving a petition for writ of habeas corpus based on a claim of "trial error," such as the denial of the right to present a defense, relief is not available if the error in question is harmless.  *See, e.g., Fleming v. Metrish*, 556 F.3d 520, 533-36 (6th Cir. 2009); *Ferensic v. Birkett*, 501 F.3d 469, 475-81 (6th Cir. 2007).  A constitutional error "is harmless unless it had a substantial and injurious effect or influence in determining the jury's verdict." *Tolliver v. Sheets*, 594 F.3d 900, 923-24 (6th Cir. 2010) (citing *Fry v. Pliler*, 551 U.S. 112, 116 (2007)).  If "the court is certain that the error had no or a small effect, the error is harmless." *Sheets*, 594 F.3d at 924.  In this instance, the alleged error had little, if any, effect in determining the jury's verdict.

Petitioner argued that questioning N.H. about Pete Brown was necessary because the jury would be "wondering how does this girl know these things unless these things really happened to her, how does she know this stuff, how does she know the words that she's using other than the fact that she was prior molested by Pete Brown." (Hearing Transcript, March 3, 2004, 10-11).  It was not unreasonable for Petitioner to believe that to the extent N.H. exhibited knowledge of sex and sexual matters far beyond her years, that the jury would naturally question where (or from whom) she obtained such knowledge.  However, the notion that questioning N.H. about Pete Brown was necessary to prevent the jury from unfairly concluding that N.H. learned about such matters from Petitioner ignores the evidence presented at trial.

N.H. testified that she learned about sex and sexual matters from Petitioner.  N.H. also described the sex or sexually-related acts in which she engaged with Petitioner or at Petitioner's urging.  When interviewed by Trooper Kaiser, Petitioner acknowledged that he taught his children about sex and sexual matters.  Petitioner also confessed to engaging in various sex related acts with N.H.  Thus, even if Petitioner had been able to question N.H. about Pete Brown, at best Petitioner

27

would have been able to demonstrate that N.H. had unfortunately been sexually assaulted by two men instead of only one.  The Court fails to discern how such would have advanced Petitioner's cause.  In sum, the Court concludes that Petitioner's inability to pursue the matter in question did not have "a substantial and injurious effect or influence in determining the jury's verdict."  To the contrary, the Court concludes that exclusion of the evidence in question had a negligible, if any, effect in this matter.  Accordingly, this claim raises no issue on which habeas relief may be granted.

## CONCLUSION

For the reasons articulated herein, the undersigned concludes that Petitioner is not being confined in violation of the laws, Constitution, or treaties of the United States.  Accordingly, the undersigned recommends that Harrington's petition for writ of habeas corpus be **denied**.  The undersigned further recommends that a certificate of appealability be denied.  *See Slack v. McDaniel*, 529 U.S. 473 (2000).

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within 14 days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. W.H.s*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,


Date:  June 24, 2011                                 /s/ Ellen S. Carmody
                                                    ELLEN S. CARMODY
                                                    United States Magistrate Judge